UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TODD M. RATH,

                                        Plaintiff,

                                                          DECISION AND ORDER

                                                          12-CV-6543L

                        v.

DAVID C. PITCHER, CPA,
DAVIE KAPLAN, CPA, P.C.,

                                        Defendants.
_____


        Plaintiff Todd M. Rath brought this action against one individual, David C. Pitcher, CPA

("Pitcher"), and a corporation, Davie Kaplan, CPA, P.C., alleging nine causes of action, all relating to

defendants' provision of financial services to TGIB Marketing, Inc. ("TGIB").  Defendants have moved

to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

        As explained below, the Court is converting defendants' motion into a motion for summary

judgment, pursuant to Rules 12(d) and 56.  For the reasons that follow, the motion is granted, and the

complaint is dismissed.


                        **CONVERSION TO SUMMARY JUDGMENT**


        Before setting forth the factual background of this case, it is necessary to address the appropriate

standard of review, because that affects what evidence the Court may consider in deciding defendants'

motion.  In support of their motion to dismiss, defendants have submitted affidavits and documentary

evidence.  *See* Affidavits of David C. Pitcher (Dkt. #7-2) and Shannon Smith (Dkt. #7-3) and exhibits

attached thereto.   In opposition to the motion, plaintiff has also submitted materials outside the pleadings.  *See* Affidavit of Todd Rath (Dkt. #10-1), and Dkt. #11.

Ordinarily, a court may not look beyond the four corners of the complaint in considering a motion to dismiss.  *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000).  "However, a court may convert a motion to dismiss into a motion for summary judgment by considering extrinsic evidence, as long as the opposing party receives sufficient notice and an opportunity to respond." *Mayo v. Federal Government*, ___ Fed.Appx. ___, 2014 WL 928999, at *1 (2d Cir. 2014) (citing *Hernandez v. Coffey*, 582 F.3d 303, 307-08 (2d Cir. 2009)).

Here, both sides have submitted materials outside the pleadings.  They have thus received constructive notice that the Court could convert this to a motion for summary judgment.  Indeed, defense counsel stated at oral argument that the Court could do so, and plaintiff's counsel raised no objection.  *See* Tr. (Dkt. #19) at 30.  *See also Mayo*, ___ Fed.Appx. at ___, 2014 WL 928999, at *1 (although district court considered evidence outside the complaint, defendants provided plaintiff with unequivocal notice of the court's ability to treat their motions as motions for summary judgment; since plaintiff was afforded the opportunity to, and did, submit further evidence, district court properly converted motions to dismiss into motions for summary judgment); *Pina v. Dora Homes, Inc.*, No. 09-CV-1626, 2010 WL 2977409, at *1 (E.D.N.Y. July 22, 2010) ("Since both sides have submitted and relied upon matters outside of the pleadings, the Court need not give notice of its intent to convert") (citing *In re G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985)); *Druyan v. Jagger*, 508 F.Supp.2d 228, 236 (S.D.N.Y. 2007) ("having submitted material outside of the complaint in response to defendants' moving papers, the plaintiff cannot complain that she lacked the requisite notice if the court treats defendants' motion as a motion for summary judgment").

The Court therefore treats the present motion as a motion for summary judgment.  Accordingly, the fundamental question is whether, construing all the evidence in the record in the light most

favorable to plaintiff, the non-moving party, a rational jury could find in his favor. *Rivera v. Rochester Genesee Regional Transp. Auth.*, ___ F.3d ___, 2014 WL 518791, at *5 (2d Cir. 2014); *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009); *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007).

## BACKGROUND

According to the complaint, plaintiff was employed by, and was a shareholder of, TGIB from January 2002 until early 2008.  (Dkt. #1, ¶ 7).  The record shows that as of May 9, 2008, Rath owned 300 of TGIB's 1136.4 shares.  Dkt. #7-3 at 21.

Defendant Pitcher is a certified public accountant ("CPA") who at all relevant times was employed by Davie Kaplan, which is a New York corporation that is in the business of providing accounting services.

In early 2005, Pitcher, "acting as both TGIB and Rath's CPA, proposed to TGIB and Rath" that TGIB form a so-called 419 plan for TGIB's employees.  A 419 plan, which is named after the relevant section of the Internal Revenue Code, *see* 26 U.S.C. § 419, is a type of employer-sponsored employee welfare benefit plan.  *See J & M Associates, Inc. v. Callahan*, 753 F.Supp.2d 1183, 1186 (S.D.Ala. 2010).

The details of how such plans work are not particularly important for purposes of the pending motions.  What matters here is that Pitcher allegedly advised Rath that "TGIB could take large tax deductions" for funding a 419 plan.  Complaint ¶ 9.

In fact, plaintiff alleges, this proposed plan was a "tax fiction," and provided no lawful tax deductions.  Complaint ¶ 10.  Plaintiff alleges that prior to 2005, the Internal Revenue Service ("IRS") had issued rulings and opinions making clear that 419 plans did not offer the tax advantages claimed

by defendants.  *See* Complaint ¶¶ 12, 13; IRS Notice 95-34 (June 5, 1995); IRS Notice 2000-15 (Mar.

20, 2000).

Plaintiff alleges that in reliance on Pitcher's advice, TGIB formed a 419 plan ("Plan") in April

2005, and bought a $2.9 million variable life insurance policy ("Hartford Policy") to fund the Plan.

Complaint ¶¶ 15, 17.  From May 2005 to May 2007, TGIB allegedly contributed $300,000 to the plan

and the underlying policy.  Complaint ¶ 18.

Besides the lack of tax advantages cited above, plaintiff also claims that the Plan and the policy

were not suitable for TGIB in several other respects as well.  Complaint ¶¶ 20-22.  Plaintiff alleges that

he "has lost $180,000 as the direct and proximate cause of being invested in the Hartford Policy," and

that he has incurred $17,500 in tax liability that he would not have incurred but for the ill-advised Plan

and TGIB's purchase of the Hartford Policy.  Complaint ¶¶ 24, 27.

According to defendants, in early 2008 Rath informed the other two shareholders, Smith and

Thomas Rath, that he intended to leave the company and that he wanted to make arrangements to have

his stock shares redeemed.[1]  At that point, TGIB was negotiating for a possible sale of the company.

The three shareholders eventually entered into a "Shareholders Agreement Pending Sale of

Company" ("Shareholders Agreement") (Dkt. #7-3 Ex. E).  The Shareholders Agreement set forth

various provisions regarding Rath's compensation in connection with the sale of, and his departure

from, the company.  *Id.*  That agreement also referenced a "Buy/Sell Agreement" which, among other

things, provided for the purchase of a shareholder's shares in the event that a shareholder sought to

dispose of his shares.  Dkt. #7-3 at 21.  The Shareholders Agreement provided that the terms of the

Buy/Sell Agreement would be suspended until after the sale of the corporation.  Dkt. #7-3 at 23 ¶ 2.

Not long after the three shareholders entered into the Shareholders Agreement, Smith and

Thomas Rath allegedly discovered that plaintiff had breached his fiduciary duties to TGIB, by becoming

---

[1]Todd and Thomas Rath are brothers.  In this Decision and Order, references to "Rath"
are to plaintiff Todd Rath.

involved in a business that would compete with TGIB.  Smith and Thomas Rath then brought an action on behalf of TGIB against plaintiff in state court, seeking injunctive and declaratory relief.  *See* Dkt. #7-3 Ex. F.

That lawsuit was eventually settled.  As a part of the settlement, the parties entered into a "Share Purchase Agreement" (Dkt. #7-3 Ex. H), whereby TGIB agreed to purchase plaintiff's 300 shares of TGIB stock.  That agreement referenced an ongoing audit by the IRS into TGIB's 419 plan, and provided, *inter alia*, that TGIB would use its best efforts to reduce Rath's tax liability with respect to that audit.  Dkt. #7-3 at 74 ¶ 12.

According to Smith, she and Thomas Rath agreed with plaintiff that TGIB would indemnify him "for any expense that he incurred in connection with the audit of his 2005, 2006 and 2007 tax return [sic] in excess of $60,000."  Dkt. #7-3 at 5.  Following the resolution of the IRS matter in 2011, TGIB reimbursed plaintiff for about $67,000, which represented the state and federal taxes and costs that he had incurred in excess of $60,000.  Dkt. #7-3 at 6.

Smith states that Rath then asked her and Thomas Rath to agree to have TGIB pay him the amount of the income taxes that he would be required to pay on the $67,000.  They declined to do so, on the ground that such costs were not provided for by the parties' indemnification agreement.  Dkt. #7-3 at 6.

The parties differ on the numbers, but plaintiff's version of the material facts is largely the same.  He contends that TGIB paid him $55,000 to reimburse him for taxes and related charges that he was assessed by the IRS, and that after he reported that $55,000 on his tax returns, he was required to pay an additional $17,500 in taxes and related charges.  Complaint ¶¶ 25-27.

Based on these facts and allegations, plaintiff filed the complaint in this action on October 5, 2012.  He asserts nine causes of action against Pitcher and Davie Kaplan:  (1) "fraudulent tax advice"; (2) "fraudulent insurance advice"; (3) breach of fiduciary duty; (4) constructive fraud; (5) negligent

misrepresentation; (6) accounting malpractice; (7) "insurance producer malpractice"; (8) unjust enrichment; and (9) breach of contract.

## DISCUSSION

### I. Standing

Defendant contends that Rath lacks standing to bring his claims.  Since "[s]tanding is ... a threshold question in every case," *Wilson v. HSBC Mortgage Services, Inc.*, ___ F.3d ___, 2014 563457, at *4 (1st Cir. 2014) (quoting *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 67 (1st Cir. 2003)), the Court addresses this contention first.

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Constitutional, or "Article III" standing depends on whether a live case and controversy exists. *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994).  Prudential, or third-party, standing relates to whether the plaintiff before the court is seeking to vindicate his own, or someone else's rights.  *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).

The issue in this case concerns prudential standing, *i.e.*, whether plaintiff is legally entitled to bring claims for the alleged harms here.  Defendants contend that plaintiff has no standing to assert the claims presented here because it was TGIB, not plaintiff, that funded the 419 plan.  Furthermore, defendants argue, plaintiff has not been an employee or shareholder of TGIB since 2009.

In response, plaintiff contends that he has personally suffered monetary losses.  Plaintiff alleges that he "has lost $180,000 as the direct and proximate result of being invested in the Hartford Policy." Dkt. #1 ¶ 24.  That is apparently based on the allegations that "TGIB contributed $300,000" to fund the

policy, and that "[t]he present cash surrender value of the Hartford Policy is $120,000." Complaint ¶¶ 18, 23.[2]

That claim is meritless. From the allegations of the complaint, not one cent of the money that was used to fund the Plan came directly from Rath. In his memorandum of law, Rath contends that the money spent by TGIB to fund the Plan constituted part of his compensation, *see* Dkt. #10 at 14, but that conclusory allegation is not supported by any facts. Rath's brief cites his own affidavit, but all he states there is that "TGIB contributed $300,000 to the 419A Benefit Plan for [his] benefit," and that "[b]ecause [he] was the beneficiary of TGIB's contributions to the 419A Benefit Plan Trust, [he] was ultimately responsible for paying the tax on those contributions." Dkt. #10-1 ¶¶ 8, 9. That TGIB paid funds into the plan for Rath's *benefit* does not mean that those funds were *his*, in a way that the loss or depreciation of those funds gives him standing to sue.

In opposition to defendants' motion, Rath also relies on the "zone of interest" doctrine, under which a plaintiff may be deemed to have standing if his alleged injury falls within the "zone of interest" that is protected by the relevant law. What plaintiff neglects to mention, however, is that this doctrine has been applied when a *statute* protects certain interests. *See*, *e.g.*, *Matter of Fritz v Huntington Hosp.*, 39 N.Y.2d 339, 356 (1976) ("where the Legislature has enacted a statute which envisages the enforcement of rights thereunder but does not explicitly set forth who shall have standing to maintain enforcement proceedings, ... a party suffering injury in fact and arguably falling within the zone of interest to be protected by the statute has standing to sue"); *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Int'l Union, AFL-CIO/CLC v. Cookson America, Inc.*, 710 F.3d 470, 475 (2d Cir. 2013) (labor union's complaint, claiming that employer violated certain contract, was within zone of interests protected by federal statute providing federal jurisdiction over suits by unions for violation of labor contracts in industries affecting commerce).

---

[2]Defendants contend that the cash surrender value of the policy at the time of the Plan's termination was $173,000. The specific numbers involved do not affect the legal issues here, however.

Plaintiff also argues that he has standing because defendants' wrongful acts caused him to incur some $17,500 in tax liability.  As stated, that stems from TGIB's payment to plaintiff of an amount (either $55,000 or $67,000, *see supra* at 5) that was intended to compensate him for his preexisting tax liability.  In other words, plaintiff was compensated by TGIB for his tax liability, but he was then required to pay additional taxes on that compensation.

Defendant appears to concede that plaintiff has standing as to this claim for $17,500 in taxes. *See* Def. Mem. (Dkt. #7-4) at 11-12.  Defendant argues that on the merits, plaintiff is not entitled to recover that amount, *id.*, but insofar as this claim relates to money actually paid by plaintiff, I find that he has standing to pursue this claim.  That amount represents plaintiff's actual out-of-pocket losses, which were allegedly incurred as a result of defendant's wrongdoing.  Whether plaintiff is entitled to recover that amount presents a different question, but plaintiff has at least met the threshold of standing.

## II. Statute of Limitations

Defendant contends that plaintiff's claims are time-barred.  Specifically, defendant asserts that because all of plaintiff's claims arise from the same facts as his accounting malpractice claim, and seek the same damages, they are all subject to the three-year statute of limitations for an action for accounting malpractice pursuant to N.Y. C.P.L.R. § 214(6).

Defendant further argues that the latest date on which plaintiff's claims could have accrued is September 9, 2009, when plaintiff and Smith, on behalf of TGIB, executed powers of attorney authorizing the law firm of Ryan, Rapp & Underwood ("Ryan Rapp") to represent them in connection with the IRS proceedings. *See* Dkt. #7-3 Ex. B. As of that date, defendants argue, defendants no longer represented TGIB or any of the shareholders in connection with the IRS audit, or for any other matters related to this lawsuit.  That date was more than three years before the complaint in this action was filed on October 5, 2012.

- 8 -

In response, plaintiff relies on two communications from Pitcher.  First, on October 8, 2009, Pitcher sent a letter to Kenneth Bersani, an attorney who was apparently representing plaintiff at that time, stating:

> As the accountant for TGIB Marketing, Inc., and the representative of Todd Rath and his spouse in connection with the ongoing audit of the Internal Revenue Service concerning the tax effect of the company's plan established under IRC Section 419, I hereby represent and warrant to Mr. Rath and his spouse that their total tax liability for all years under audit is approximately $60,000.00, and may be less.

Dkt. #11 Ex. A.  Second, on May 18, 2011, Pitcher sent an email to Priscilla Kelley at Ryan Rapp, stating that the IRS's computation of Rath's tax liability was correct.  Dkt. #11 Ex. B.

"In the context of a malpractice action against an accountant, the claim accrues upon the client's receipt of the accountant's work product since this is the point that a client reasonably relies on the accountant's skill and advice ... .  This is the time when all the facts necessary to the cause of action have occurred and an injured party can obtain relief in court ... ."  *Ackerman v. Price Waterhouse*, 84 N.Y.2d 535, 541 (1994).  However, the accrual date may be tolled where the parties engaged in a continuous professional relationship.  *Giarratano v. Silver*, 46 A.D.3d 1053, 1055 (2d Dep't 2007).

It is clear from the evidence that with respect to the creation of the Plan, defendants' services on behalf of plaintiff ended no later than September 9, 2009, when plaintiff and the other TGIB shareholders signed powers of attorney authorizing Ryan Rapp to represent them in connection with the pending IRS proceedings.  In fact, it appears that defendants had stopped providing accounting services to plaintiff before then, but in any event there is no evidence that defendants continued to provide services to plaintiff beyond September 9, 2009, or at any time within three years prior to the commencement of this lawsuit.

The October 9, 2009 letter and May 18, 2011 email from Pitcher do not render plaintiff's claims timely.  Although New York recognizes the "continuous representation" doctrine, that only applies where the parties have a "a mutual understanding of the need for further representation on the specific subject underlying the malpractice claim."  *McDonald v. Edelman & Edelman, P.C.*, 111 A.D.3d 457,

428 (1st Dep't 2013) (citing *Williamson v. PricewaterhouseCoopers LLP*, 9 N.Y.3d 1, 9-10 (2007)). The kinds of discrete communications here do not trigger the doctrine, since they clearly were not part of continuous, agreed-upon course of representation. *See Williamson ex rel. Lipper Convertibles, L.P. v. PricewaterhouseCoopers LLP*, 9 N.Y.3d 1, 10 (2007); *Hadda v. Lissner & Lissner LLP*, 99 A.D.3d 476, 477 (1st Dep't 2012).

Plaintiff's claim for so-called "insurance producer malpractice" is also time-barred. A claim against an insurance broker (which is properly characterized as a claim for breach of contract, rather than for malpractice, *see 20 Clarke Place Realty Corp. v. Rudges and Co.*, 267 A.D.2d 141, 141 (1st Dep't 1999), *aff'd as modified on other grounds*, 96 N.Y.2d 767 (2001), is governed by a six-year statute of limitations, which generally begins to run upon the insured's receipt of the certificate of insurance. *Hennessey v. General Acc. Ins. Co. of America*, 257 A.D.2d 750, 751 (3d Dep't 1999). The policy here was sold in 2005, and this suit was commenced in 2012, well outside the limitations period. Plaintiff has not identified any act by defendants in their role as insurance brokers within the six years prior to the commencement of this action.

Plaintiff's claims for breach of fiduciary duty, unjust enrichment, breach of contract, and negligent misrepresentation are duplicative of the malpractice claim. They are therefore subject to dismissal on limitations grounds as well. *See Whylie v. Pager*, 39 Misc.3d 1213(A) (Sup. Ct. Kings County 2013) (dismissing breach of contract claim based on three-year statute of limitations applicable to malpractice claim).

In any event, these claims are also subject to dismissal as duplicative of the accounting malpractice claim. *See Cosmetics Plus Group, Ltd. v. Traub*, 105 A.D.3d 134, 143 (1st Dep't 2013) ("we find that the cause of action for breach of fiduciary duty was properly dismissed as duplicative of the legal malpractice claim. It arose out of the same facts as the legal malpractice claim and did not involve any damages that were separate and distinct from those generated by the alleged malpractice"); *Citidress II Corp. v. Tokayer*, 105 A.D.3d 798, 799 (2d Dep't 2013) (reaching same conclusion as to breach of contract claim). *See also Cusack v. Greenberg Traurig, LLP*, 109 A.D.3d 747, 748 (1st Dep't

- 10 -

2013); *Vermont Mutual Ins. Co. v. McCabe & Mack, LLP*, 105 A.D.3d 837, 839-40 (2d Dep't 2013); *Hadda*, 99 A.D.3d at 477; *Town of Walkill v. Rosenstein*, 40 A.D.3d 972, 974 (2d Dep't 2007).

### III. Fraud Claims

Plaintiff's fraud claims are also subject to dismissal, but because they present certain additional issues, the Court addresses them separately.

First, these claims are also time-barred. Although fraud claims are generally subject to a six-year statute of limitations, where a fraud claim is "merely incidental" to a malpractice claim, it is subject to the three-year limitations period applicable to malpractice claims. *See Scott v. Fields*, 85 A.D.3d 756, 758 (2d Dep't 2011). Here, the alleged fraud is part and parcel with the alleged malpractice, and is therefore both time-barred and duplicative of the malpractice claim. *See Cusack*, 109 A.D.3d at 748.

In addition, plaintiff's allegations do not make out a facially valid claim under any theory of fraud. Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances constituting fraud ... must be stated with particularity.'" This requirement "demands that a plaintiff '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Woods v. Maytag Co.*, No. 10 Civ. 0559, 2010 WL 4314313 at *5 (E.D.N.Y. Nov. 2, 2010) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).

Plaintiff has failed to meet that standard. The complaint contains only the sparsest of allegations, to the effect that Pitcher advised TGIB to set up a 419 plan, based on some purported tax advantages of such plans, which proved to be nonexistent.

Nor do plaintiff's further submissions in opposition to defendants' motion save these claims. Plaintiff identifies the allegedly fraudulent statements only in the most general terms; the gist of the complaint is simply that defendants gave TGIB bad advice. There are still no particulars as to what fraudulent representations were made, other than a vague allegation that around a certain time period, defendants advised TGIB–incorrectly, as it turned out–that TGIB would benefit from setting up a 419

plan. That repackaging of plaintiff's malpractice claim does not show fraud.  *See White of Lake George v. Bell*, 251 A.D.2d 777, 778 (3d Dep't 1998) ("The majority of the allegations comprising plaintiffs' fraud claim consist, essentially, of a restatement of their accusations that defendant furnished erroneous legal advice and neglected to take appropriate steps to safeguard their interests. While these assertions, if proven, could warrant a finding of malpractice, they are insufficient, without more, to make out a separate cause of action for fraud").

With respect to defendants' allegedly fraudulent statements, plaintiff points out in his brief that the complaint cites certain IRS notices, *see* Dkt. #10 at 15.  But those statements cannot supply the "statement" element of a fraud claim.  They were not made by defendants, nor are they alleged to be false.  All that plaintiff argues from them is that they show that defendants should have known better than to recommend a 419 plan to TGIB.  That does not supply the particularity required by Rule 9(b).

Finally, while Rule 9(b) does not demand that a plaintiff plead detailed evidentiary matter with respect to the defendants' state of mind, the plaintiff must still allege facts giving rise to a strong inference of fraudulent intent.  *See Space Hunters, Inc. v. United States*, 500 Fed.Appx. 76, 80 (2d Cir. 2012).  "[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.  An ample factual basis must be supplied to support the charges."  *O'Brien v. National Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quoted in *Wood ex rel. U.S. v. Applied Research Associates, Inc.*, 328 Fed.Appx. 744, 747 (2d Cir. 2009), *cert. denied*, 559 U.S. 929 (2010)).

Here, plaintiff argues in his brief that "Pitcher was blinded by the opportunity to churn huge insurance commissions at Rath's expense," Dkt. #10 at 16, but he offers no evidence in support of that assertion.  Speculation is not enough.  That is all that plaintiff has presented, and his fraud-based claims must therefore be dismissed.

## IV. Other Matters

There are additional defects in plaintiff's claims, which need only be briefly mentioned.  First, New York does not recognize a fiduciary relationship in the context of an accountant and his client, unless the accountant actively managed the client's financial affairs.  *See Cohen v. Cohen*, ___ F.Supp.2d ___, 2014 WL 279555, at *10 (S.D.N.Y. Jan. 27, 2014).  There are no allegations or evidence demonstrating that sort of relationship here between plaintiff and defendants.

Second, plaintiff has failed to state a claim for unjust enrichment.  It is not enough that plaintiff claims that he has been damaged, by having to pay certain taxes to the IRS, and that defendants profited in some way from providing services to TGIB.  "To sustain a claim of unjust enrichment a plaintiff must show that the defendant has at the plaintiff's expense been enriched and unjustly so, such as when the defendant receives requested goods or services without paying any compensation therefor."  *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 37 (2d Cir. 1979) (quoted in *Hudson & Broad, Inc. v. J.C. Penney Corp., Inc.*, ___ Fed.Appx. ___, 2014 WL 292192, at *3 (2d Cir. 2014)).  No such showing has been made here.

## CONCLUSION

Defendants' motion to dismiss the complaint (Dkt. #7), which the Court has converted into a motion for summary judgment, is granted, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       March 28, 2014.